**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JASON GROSS,**

**Plaintiff,**

**Case No. 2:12-cv-12**
**JUDGE SMITH**
**Magistrate Judge Kemp**

**v.**

**VILLAGE OF MINERVA PARK**
**VILLAGE COUNCIL,** *et al.***,**

**Defendants.**

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 47), Defendants' Motion for Summary Judgment (Doc. 50), and what is fairly characterized as a motion by Defendants for leave to supplement their motion for summary judgment (Doc. 54).  All motions are fully briefed and ripe for decision.  For the reasons that follow, the Court **GRANTS** Defendants' motion to supplement, **GRANTS** Plaintiff's Motion for Partial Summary Judgment, and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.

## I.     BACKGROUND

Plaintiff, Jason Gross, was employed by the Village of Minerva Park as a police officer. (Doc. 47, Ex. 1, Adm. by Def. at 5).  Defendant, Lynn Eisentrout, is Mayor of the Village. (Doc. 51, Ex. 3, Eisentrout Depo. at 7:7-7:9).  Defendant, Kimberly Nuesse, is the Chief of Police for the Village. (Doc. 27, 2d. Amend. Compl. at ¶ 6; Doc. 28, 4th Answer at ¶ 6).

On July 18, 2011, following allegations that, among other things, Gross had misrepresented department policy to other organizations, Eisentrout wrote a letter to Gross in which she purported to terminate Gross' employment as a police officer.  Eisentrout wrote:

> On July 14, 2011, I received the final report from Chief Kimberly Nuesse and discussed it at length with her.  . . . .  I am in agreement with Chief Nuesse's recommendation that your employment with the Minerva Park Police Department be terminated immediately.
>
> In accordance with Section 737.19(B) [Ohio Rev. Code § 737.19(B) (1996)], I am obligated in[sic] inform you that you "may appeal your removal from the police department to [sic] legislative authority within five days from the date of my judgment.  The legislative authority shall hear the appeal at its next regularly scheduled meeting.  The person against whom the judgment has been rendered may appear in person and by counsel at the hearing, examine all witnesses, and answer all charges against that person."
>
> Please return all equipment and identification belonging to the Minerva Park Police Department within two business days (July 20, 2011) to Chief Nuesse.

(Doc. 53, Ex. A, Eisentrout Ltr. 07/18/11).  Gross was served with this letter on July 18, 2011, by hand delivery at the same time he was first given notice of the charges against him. (Doc. 51, Ex. 3, Eisentrout Depo. at 47:4-47:9; Doc. 47, Ex. 2, Eisentrout Council Testimony at 200:11-200:22; Doc. 56, Ex. 2, Nuesse Council Testimony at 172:9-172:20).  A few days later, through counsel, Gross expressed his intention to appeal.

Eight days after Eisentrout's letter, on July 26, 2011, Jennifer Croghan, Solicitor/Law Director for the Village of Minerva Park, sent a letter to Gross' counsel explaining that, in light of his decision to appeal, Gross would be placed on paid administrative leave with pay and benefits dating back to July 18, 2011, pending the appeal. (Doc. 53, Ex. B, Croghan Aff. at ¶ 4).  This letter spawned a series of communications between Croghan and Gross' counsel, Grant Shoub, regarding whether the termination by Eisentrout was indeed a termination or merely a "proposed termination" or "recommendation to terminate." (*See* Doc. 53, Exs. B1-B4, Croghan/Shoub Ltrs. 07/26/11).  With neither side agreeing on the appropriate nomenclature, the

appeal Gross sought went forward, with hearings before the Village Council on the matter of Gross' continued employment on September 21 and 26, 2011. (Doc. 27, Ex. B, Council Rpt. at 3).

Following deliberations in the wake of the September 26th hearing, the Council "modifie[d] the Mayor's termination of Jason Gross as a police officer for the Village of Minerva Park" and instead "set[] forth [] discipline for the violation(s)" which took the form of "a three-week suspension without pay . . . ." *Id.* at 6.  The suspension began on September 27, 2011. *Id.*

Following the suspension, and his reinstatement, on December 7, 2011, Gross filed a lawsuit in the Franklin County Court of Common Pleas. (Doc. 3, Compl.).  That case, once removed by Defendants, became this case, number 2:12-cv-12. (Doc. 2, Not. of Remov.).  In the course of litigating, the parties participated in mediation sessions on June 29, 2012, and July 25, 2012, before a magistrate judge of the United States District Court for the Southern District of Ohio.  Neither mediation resulted in the settlement of the lawsuit.

On August 1, 2012, Gross received a "Memo" informing him that he was being placed on "paid administrative leave pending an investigation of [his] recent conduct which may result in disciplinary action." (Doc. 27, Ex. D, Nuesse Memo. 08/01/12 at 1).  This was followed, on August 10, by a 12-page letter from Nuesse (that copied Eisentrout) alleging a "continued pattern of incompetence, neglect of duty and failure to obey orders" and recommending that the Mayor terminate Gross' employment with the police. (Doc. 27, Ex. E, Nuesse Ltr. 08/10/12 at 1, 12). Nuesse's letter advised Gross that within five days, the Mayor would "inquire into the matter and render judgment on it." *Id.* at 12.  He could, Nuesse's letter said, advise the Mayor within those

five days that he would like to meet with the Mayor to "discuss the[] charges as part of her inquiry . . . ." *Id.*

The same day, August 10, Gross gave the letter to his attorney. (Doc. 51, Ex. 1, Gross Depo. at 63:4-63:21, 145:19-146:9; *see also* Doc. 51, Ex. 4, Depo. Ex. A, Nuesse Ltr. 08/10/12). Within the 5-day window, on August 13, 2012, Gross' attorney requested a "pre-disciplinary hearing" and copies of several documents in order to prepare. (Doc. 51, Ex. 4, Depo. Ex. E, Shoub Ltr. 08/13/12).  The Village responded the next morning with the requested documents and a letter. (Doc. 51, Ex. 4, Depo. Ex. F, Croghan Ltr. 08/14/12).  In the letter, the Village Law Director opined that the Mayor was not required by law to grant Gross a "pre-disciplinary hearing" but did offer a meeting with the Mayor at 6:15 p.m. that day or any time between 7:30 a.m. and 10:00 a.m. the next day. *Id.* at 1.  Gross' counsel responded that same day by letter. (Doc. 51, Ex. 4, Depo. Ex. G, Shoub Ltr. 08/14/12).  He explained that neither he nor Gross were available during the offered times and that, in any case, such short notice would not give him time to review materials in preparation for the meeting. *Id.*  Neither Gross nor his attorney met with the Mayor. (Doc. 51, Ex. 1, Gross Depo. at 146:17-150:12).  Thus, on August 15, the Mayor again issued a letter (substantially identical to that issued in July of 2011) purporting to terminate Gross' employment. (Doc. 51, Ex. 4, Depo. Ex. C, Eisentrout Ltr. 08/15/12).  However, unlike the July event, Gross did not appeal this action to the Village Council. (Doc. 51, Ex. 1, Gross Depo. at 34:18-41:4) (Gross explaining that he did not appeal).  Thus, on August 15, Gross was terminated and this time, he remained so.

In this lawsuit, Plaintiff, Jason Gross, sues Defendants, Lynn Eisentrout and Kimberly Nuesse, both in their individual capacities and in their capacities as Mayor and Chief of Police of the Village of Minerva Park, respectively. (Doc. 27, 2d. Amend. Compl. at ¶¶ 7-14, 27-30).

4

According to the second amended complaint, Gross claims against Eisentrout and Nuesse under the aegis of 42 U.S.C. § 1983. *Id.* He brings claims based on the Fourteenth Amendment Due Process Clause for their failure to provide him with a pre-disciplinary hearing prior to firing him on July 18, 2011, and August 15, 2012. *Id.* Gross also claims against both Eisentrout and Nuesse for First Amendment retaliation based on two theories:[1] First, that the August 15, 2012 termination and events leading up to it, was in retaliation for his filing and failing to settle the instant lawsuit. *Id.* at ¶¶ 15-26. Second, that the July 18, 2011 termination was based on protected comments that he made to Mothers Against Drunk Driving (MADD). *Id.*

Plaintiff has moved for partial summary judgment on his due process claim against Eisentrout arising out of her failure to provide him with a pre-disciplinary hearing before allegedly terminating his employment on July 18, 2011. (Doc. 47, P. Mot. for Part. SMJ). Defendants have also moved for summary judgment as to all claims. (Doc. 50, D. Mot. for SMJ).

## II.     STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

---

[1] Plaintiff's complaint references several theories, but these are the two he argues on summary judgment. (Doc. 56, P. Re. in Opp. to Mot. for SMJ at 3-4, 6-11).

trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any reasonable inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *See, e.g.*, *Crawford v. Metro. Gov't*, 555 U.S. 271, 274 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004)); *Muncie Power Prods., Inc.*, 328 F.3d at 873 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the

material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

For the reasons that follow, the Court shall **GRANT** Plaintiff's Motion for Partial Summary Judgment, and **GRANT IN PART** and **DENY IN PART** Defendants' Motion for Summary Judgment. Before proceeding to the merits, however, there is a preliminary motion that must be addressed.

Defendants, shortly after filing their motion for summary judgment, and before Plaintiff responded, moved to supplement their summary judgment motion with facts not originally submitted in support of their motion. (Doc. 54, D. Mot. to Supp.). Plaintiff opposes this motion. (Doc. 55, P. Re. in Opp. to Mot. to Supp.). However, the evidence establishing the facts was attached to Defendants' response to Plaintiff's Motion for Partial Summary Judgment. (Doc. 53, Ex. A). Thus, the evidence is already within the summary judgment record and the motion, therefore, is of little remaining import. *Matsushita*, 475 U.S. at 587 (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").[2] Nonetheless, because it changes little and because it is within the Court's discretion to do so, Defendants' motion to supplement is **GRANTED**.

---

[2] It could be argued that, as Federal Rule of Civil Procedure 56(c)(3) only compels courts to consider "the cited materials" and Defendants did not cite their newly introduced materials in their motion for summary judgment, the Court could ignore those materials for purposes of deciding Defendants' motion. However, Rule 56(c)(3) is a permissive restriction – not a mandated one – and the Court feels that, in this case, justice will be better served by consideration of the whole summary judgment record.

### A.  Fourteenth Amendment Due Process Claim

To establish a claim for a Fourteenth Amendment due process violation, a would-be claimant must first prove a property right of constitutional significance. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); (*see also* Doc. 47, P. Mot. for SMJ at 1; Doc. 50, D. Mot. for SMJ at 9).  Second, the claimant must prove that he was deprived of this right without "constitutionally adequate procedures" to justify the deprivation. *Loudermill*, 470 U.S. at 541; (Doc. 47, P. Mot. for SMJ at 7-9; Doc. 50, D. Mot. for SMJ at 9-10); *see also, e.g.*, *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999) (setting forth the elements, albeit in slightly different language).

### 1.  Whether Gross had a Property Right in his Employment

Both sides agree, correctly, that Gross had a constitutionally protected property right in his continued employment. (Doc. 47, P. Mot. for SMJ at 5-6; Doc. 50, D. Mot. for SMJ at 9). Indeed, this Court has previously considered the exact question at bar and concluded that village police officers in Ohio have a property interest in their employment:

> Defendants argue Plaintiff, as a village police officer, is an unclassified civil servant.  As such, Defendants maintain case law establishes that unclassified civil servants do not have a property right to continued employment. *See Vodila v. Clelland*, 836 F.2d 231, 232 (6th Cir. 1987).  In response, Plaintiff agrees that she is not a classified civil servant.  Nonetheless, Plaintiff contends she does have a property interest in her employment as a village police office.  In support, Plaintiff relies upon *Velazquez v. Village of Bratenahl*, 2003 Ohio 878, 2003 Ohio App. LEXIS 807 (8th App. Dist. 2003).
>
> *Velazquez* involved a Village of Bratenahl police officer who argued the Village violated his constitutional rights when it terminated his employment without a pre-termination hearing.  The *Velazquez* court concluded the police officer had a property interest in his employment:
>
>> A public employee has a property interest in his public employment if state law gives him a right to continued employment. *See Deoma v. City of Shaker Heights*, 68 Ohio App. 3d 72, 587 N.E.2d 425 (1990), *and Jackson v. Kurtz*, 65 Ohio App. 2d 152, 157-158, 416 N.E.2d 1064 (1979) (both cases held that R.C. 124.34 gives classified public employees the right to continued employment except as provided therein).  In Ohio, the

termination of village police officers is governed by R.C. 737.19, which provides that village police officers may only be terminated for

> * * * incompetence, gross neglect of duty, gross immorality, habitual drunkenness, failure to obey orders given them by proper authority, or for any other reasonable or just cause.

Courts have analogized the language in O.R.C. 737.19 governing the termination of village police officers to O.R.C. 124.34 which governs the tenure, reduction, suspension, removal, and demotion of classified civil servants. *See Shaffer v. Village of West Farmington*, 82 Ohio App. 3d 579, 612 N.E.2d 1247 (1992), *Stephen v. Village of Barnesville*, 7th Dist. No. 97 BA 12, 1999 Ohio App. LEXIS 3922.  In *Loudermill*, the United States Supreme Court held that O.R.C. 124.34 creates a property interest in continued employment for classified civil servants because such employees can only be terminated for cause. *Loudermill*, *supra* at 542. Similarly, because R.C. 737.19 allows the termination of village police officers only for just or reasonable cause, R.C. 737.19 confers a property interest in continued employment to the employee.

Upon consideration, the Court finds merit in the analysis set forth by the *Velazquez* court.  Accordingly, the Court concludes Ohio law provides Plaintiff with a right to continued employment as a village police officer, and thus, a property interest in her employment.

*Lowe v. Vill. of McArthur*, Case No. 2:06-cv-738, 2007 U.S. Dist. LEXIS 12740, *8-9 (S.D. Ohio Feb. 23, 2007) (Watson, J.).  The Court adheres to its prior ruling in *Lowe*.  Gross had a property interest in his continued employment as a police officer.

### 2. Whether Gross was Deprived of Property Without Due Process with Respect to the July 18, 2011 Firing

#### a. Whether Gross was, in fact, Fired on July 18, 2011, and, if so, by Whom

Neither party disputes what was said and done in relation to the alleged firing on July 18, 2011.  The parties agree, for instance, that, on July 18, 2011, Eisentrout sent a letter to Gross stating:

> On July 14, 2011, I received the final report from Chief Kimberly Nuesse and discussed it at length with her.  . . . .  I am in agreement with Chief Nuesse's recommendation that your employment with the Minerva Park Police Department be terminated immediately.
>
> In accordance with Section 737.19(B), I am obligated in[sic] inform you that you "may appeal your removal from the police department to [sic] legislative authority within five days from the date of my judgment.  . . . .

9

> Please return all equipment and identification belonging to the Minerva Park
> Police Department within two business days (July 20, 2011) to Chief Nuesse.

(Doc. 53, Ex. A, Eisentrout Ltr. 7/18/11).  Neither side disputes that, on July 26, 2011, Jennifer

Croghan, Solicitor/Law Director for the Village of Minerva Park, sent a letter to Gross' counsel

explaining that, in light of his decision to appeal, Gross would be placed on paid administrative

leave with pay and benefits dating back to July 18, 2011, pending the appeal of the termination.

(Doc. 53, Ex. B, Croghan Aff. at ¶ 4).  Neither side disputes that the Village solicitor and Gross'

counsel exchanged correspondence about whether the termination by Eisentrout was indeed a

termination or merely a "proposed termination" or "recommendation to terminate." (*See* Doc. 53,

Exs. B1-B4, Croghan/Shoub Ltrs. 07/26/11).  Records confirm that Gross was treated (after

deciding to appeal) as if he were on administrative leave and neither side has argued with this

fact. (Doc. 53, Ex. C-1, Gross Timesheets/Pay Recs. *in passim*).

The question, however, is: On these undisputed facts, was Jason Gross terminated or

placed on administrative leave on July 18, 2011?  Making such a factual characterization might,

under some circumstances, be perceived as inappropriate in deciding summary judgment.

However, a number of factors (not least that there is no dispute about what happened – only how

to characterize what happened) convince the Court that, in this case, it is not inappropriate.

First, Defendants have repeatedly admitted in this litigation that Eisentrout's action, on

July 18, 2011, was a termination.  Plaintiff alleged in each of his three complaints that Gross'

employment was terminated by Eisentrout on July 18, 2011, and Defendants, in four

corresponding answers – including the currently operative complaint and answer – admitted the

fact. (*See* Doc. 3, Compl. at ¶ 15 *and* Doc. 6, Answer at ¶ 12 *and* Doc. 7, Amend. Answer at ¶

12; Doc. 15, Amend. Compl. at ¶ 16 *and* Doc. 16 3d. Answer at ¶ 16; Doc. 27 2d. Amend.

Compl. at ¶ 8 *and* Doc. 28, 4th Answer at ¶ 8); *see also Hughes v. Vanderbilt Univ.*, 215 F.3d

10

543, 549 (6th Cir. 2000) ("Plaintiffs are bound by admissions in their pleadings . . . ."); *Ferguson v. Neighborhood Hous. Servs., Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (quoting *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980)) ("This court has observed that 'under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.'").  Defendants also admitted that the July 2011 action was a termination when they responded to Plaintiff's first request for admission. (Doc. 47, Ex. 1, Adm. by Def. at 5); *see also Tracy v. Heffron*, 822 F.2d 60, 60 (6th Cir. 1987) (citing Fed. R. Civ. P. 56(b)) (holding that even requests for admission that are not answered and thus, admitted, "are binding for purposes of this action"); *accord Info-Hold, Inc. v. Muzak LLC*, Case No. 1:11-cv-283, 2013 U.S. Dist. LEXIS 32238, *7 (S.D. Ohio Mar. 8, 2013).  Defendants, even as recently as their motion for summary judgment, were still repeatedly characterizing the July 2011 action as a termination. (Doc. 50, D. Mot. for SMJ at 2, 5, 12-13, 20).

Second, there are facts in the summary judgment record that suggest that Defendant's original characterization of the July 18, 2011 action is the correct one.  For instance, although Plaintiff was awarded pay and considered placed on administrative leave as of July 18, 2011, this action did not occur until days after his firing – and only then, at the prompting of Plaintiff's counsel. (Doc. 53, Ex. B-2, Croghan Ltr. 07/26/11).  That is, only on July 21, 2011, did Gross' attorney write to the Village Law Director "appealing the termination of Jason Gross to [sic] Village Council." *Id.*  And only days after that, did the Law Director say, "Pending his appeal, Jason Gross will be on paid administrative leave." *Id.*  That is, from July 18, 2011, until appealing, Plaintiff was fired and, had he not appealed, it is clear he would have remained so.  In addition, Mayor Eisentrout admitted, both in testimony before the Village Council and in deposition in this case, that she had, as of her letter on July 18, 2011, made the decision to fire

11

Gross. (Doc. 47, Ex. 2, Eisentrout Council Testimony at 198:24-199:6; Doc. 51, Ex. 3, Eisentrout Depo. at 46:15-47:13).  Moreover, the Village (as spoken for by the Village Council) clearly recognized that Gross had been terminated when, following the September 26th appeal hearing, the Council wrote that it "hereby modifies the Mayor's termination of Jason Gross as a police officer for the Village of Minerva Park . . . ." (Doc. 27, Ex. B, Council Rpt. at 6).

On July 18, 2011, Jason Gross was fired.  That he was retroactively placed on administrative leave, or that his appeal was ultimately successful, does not alter the fact that on July 18, 2011, he was fired.  Moreover, as should be clear from the factual recitation above, the mayor, Eisentrout, is the defendant who made the decision to fire Gross.  As Eisentrout says in her July 18 letter, Chief Nuesse merely recommended the firing. (Doc. 53, Ex. A, Eisentrout Ltr. 7/18/11).  In short, Gross was fired, on July 18, by Eisentrout.  Thus, the question now is: Did he receive the process that was due to him before being firing?

### b. Due Process Requires a Pre-Discipline Hearing and Gross did not Receive one Prior to his July 18, 2011 Firing

Plaintiff was entitled to some kind of hearing prior to being fired.  Indeed, the Supreme Court has "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'" *Loudermill*, 470 U.S. at 542 (emphasis in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  "This principle," the Court specified, "requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Id.* (citing *Board of Regents v. Roth*, 408 U.S., at 569-570; *Perry v. Sindermann*, 408 U.S. 593, 599 (1972)).  Of particular salience to this case, the Supreme Court explained:

> The need for some form of pretermination hearing . . . is evident . . . .
>
> . . . .

12

> Dismissals for cause will often involve factual disputes. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 686 (1979).  Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the termination takes effect. *See Goss v. Lopez*, 419 U.S. [565,] 583-584 [(1975)]; *Gagnon v. Scarpelli*, 411 U.S. 778, 784-786 (1973).

*Loudermill*, 470 U.S. at 542-43.  In other words, it is too late to present one's side of the story once the decision-maker has already announced a decision.  Thus, if the constitutional guarantee of due process is to be respected, a person must have an opportunity to present his side of the story <u>before</u> a decision is rendered.

Not only does *Loudermill* provide the law in this matter, it also provides an edifying factual example.  In *Loudermill*, one of the plaintiffs was Richard Donnelly – a bus mechanic.  470 U.S. at 536.  He alleged in his complaint that he was fired, without any pre-discipline hearing, after failing an eye exam, but was reinstated following an appeal. *Id.* at 536-37.  Because Donnelly alleged that he had no chance to tell his side of the story prior to the firing, the U.S. Supreme Court agreed with the Sixth Circuit Court of Appeals in reversing the district court's dismissal. *Id.* at 547-48.  Although Donnelly had a full chance to appeal the termination and although he was ultimately successful (and thus, in some sense, not fired at all) Donnelly had stated a claim for violation of his due process rights. *Id.* at 536-37, 546-48.

In this case, it is apparent that, with respect to the July 18, 2011 firing, Gross was not afforded any opportunity to tell his side of the story before Eisentrout announced the termination.  Indeed, Defendants have admitted as much and Eisentrout expressly explained, twice, that she did not provide any such opportunity to Gross because she believed he was not entitled to it. (Doc. 47, Ex. 1, Adm. by Def. at 5).  In her deposition, she said:

> Q:      Was this a July 18th, 2011 letter that you sent or provided to Jason Gross informing him that his employment with the Village of Minerva Park had been terminated?

Eisentrout:  Yes.

Q:      And as I understand it, you did not provide Officer Gross with any sort of opportunity to have a pre-disciplinary hearing with you before you made this decision, correct?

Eisentrout:  Yes.

Q:      Is that because you believed at that time that you were not required to do that?

Eisentrout:  Correct.

Q:      As I understand it, you got a letter from Chief Nuesse recommending that Officer Gross be terminated.  You subsequently approved that, and all of that paperwork was served to Jason Gross at the same time?

Eisentrout:  Yes.

Q:      Is it still your belief today that Officer Gross was not entitled to [sic] pre-disciplinary hearing before you terminated him back in July of 2011?

Eisentrout:  Yes.

(Doc. 51, Ex. 3, Eisentrout Depo. at 46:15-47:13).  In a hearing before the Village Council she said:

Q:      So your understanding was that you were under no legal obligation to provide Officer Gross with something called a pre-disciplinary hearing?

Eisentrout:  Correct.

Q:      Correct?

Eisentrout:  Correct.

Q:      And he did not get a pre-disciplinary hearing, correct?

Eisentrout:  Correct.

Q:      And he had no opportunity whatsoever to appear before you with the charges, with the evidence, and try and convince you or persuade you or give you reasons why he should not be fired; that's an accurate statement, correct?

Eisentrout:  Correct.

Q:      In fact, [Gross] wasn't even given the charges until he was given the notice that he had been fired, correct?

Eisentrout:  That's my understanding.

Q:      He got them both the same day, correct?

14

Eisentrout:  That's my understanding.

Q:  You're not aware of him being provided a copy of the charges that were filed against him before he got your letter terminating him?

Eisentrout:  That's my understanding.

(Doc. 47, Ex. 2, Eisentrout Council Testimony at 199:19-200:22).

Gross had a property right in his employment.  He was fired from that employment by Eisentrout without "any sort of opportunity to have a pre-disciplinary hearing" with the decision-maker prior to the rendering of that decision. (Doc. 51, Ex. 3, Eisentrout Depo. at 46:21).  Thus, Gross has shown that he is entitled to summary judgment on the issue of liability against the defendant, Eisentrout, with respect to that claim.  Conversely, because, on the undisputed facts, Defendant Nuesse did not fire Gross (and thus did not deprive him of property rights), she is entitled to summary judgment on this claim.

### 3.  Whether Gross was Deprived of Property Without Due Process with Respect to the August 15, 2012 Firing

Due process requires notice and an opportunity to respond. "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Loudermill*, 470 U.S. at 546 (citing Henry Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1281 (1975)).  Where above, the analysis centered on the timing of the hearing – before a discipline decision is rendered – here it focuses on what sort of hearing is required.

The Court has discussed, throughout this opinion, (and *Loudermill* used such phrases also) the concept of a pre-termination or pre-disciplinary "hearing." *See, e.g.*, *Loudermill*, 470 U.S. at 546 (commenting that "the pretermination 'hearing,' though necessary, need not be elaborate").  This should not, however, be confused with a formal court hearing, which often connotes evidence, witnesses, and the like. *See* Black's Law Dictionary (9th ed. 2009) (defining

"hearing" as "[a] judicial session, usu. open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying").  Rather, by "hearing" the Court merely means a time and place at which to be "heard." *See Id.* (defining "hearing" in the administrative context as "[a]ny setting in which an affected person presents arguments to a decision-maker").

As Ohio Revised Code, section 737.19 provides for a relatively robust appeal process, this Court adheres to the statement of the Supreme Court in *Loudermill*, "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute." 470 U.S. at 547-48.  Or, as *Loudermill* more explicitly put it:

> The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.  To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

470 U.S. at 546 (citations omitted) (citing *Arnett v. Kennedy*, 416 U.S. 134, 170-71 (1974) (Powell, J., concurring in part and concurring in the result); *id.* at 195-96 (White, J., concurring in part and dissenting in part); *Goss*, 419 U.S. at 581).[3]

On August 1, 2012, Nuesse informed Gross that he was, effective immediately, placed on "paid administrative leave pending an investigation of [his] recent conduct which may result in disciplinary action." (Doc. 27, Ex. D, Nuesse Memo. 08/01/12 at 1).  On August 10, Nuesse

---

[3] Defendants also attempt to rely on these principles with respect to the July 18 firing. (Doc. 50, D. Mot. for SMJ at 12-13).  That is, Defendants contend that a bare-bones notice and opportunity to respond were provided to Plaintiff because he was issued a written reprimand in May of 2011 for violation of Minerva Park's jurisdictional borders. *Id.*; (Doc. 50, Ex. B, Gross Reprimand 05/04/11 at 1-2).  Thus, say Defendants, Plaintiff was on notice that his behavior was inappropriate and should have known to present his side of the story to Nuesse. (Doc. 50, D. Mot for SMJ at 12).  However, when the facts are examined, Defendants' argument is quickly identifiable as nonsense.  A written reprimand, issued to Gross in mid-May for a single incident, would not have alerted Gross, or any reasonable person, to the fact that he would be fired more than two months later for a different set of allegations. (*Compare* Doc. 50, Ex. B, Gross Reprimand 05/04/11 *with* Doc. 27, Ex. B, Council Rpt.).  With respect to the July 18 firing, Plaintiff was given neither notice nor an opportunity to be heard prior to the termination. (*See, e.g.*, Doc. 47, Ex. 2, Eisentrout Council Testimony at 199:19-200:22).

followed up with 12-pages of allegations charging a "continued pattern of incompetence, neglect of duty and failure to obey orders" and recommending to Eisentrout that she terminate Gross' employment with the police. (Doc. 27, Ex. E, Nuesse Ltr. 08/10/12 at 1, 12).  Nuesse's letter advised Gross that within five days, the Mayor would "inquire into the matter and render judgment on it." *Id.* at 12.  He could, Nuesse's letter said, advise the Mayor within those five days that he would like to meet with the Mayor to "discuss the[] charges as part of her inquiry . . . ." *Id.*

On August 13, 2012, Gross' attorney requested a "pre-disciplinary hearing" and copies of several documents in order to prepare. (Doc. 51, Ex. 4, Depo. Ex. E, Shoub Ltr. 08/13/12).  The Village responded the next morning with the requested documents and a letter. (Doc. 51, Ex. 4, Depo. Ex. F, Croghan Ltr. 08/14/12).  In the letter, the Village Law Director opined that the Mayor was not required by law to grant Gross a "pre-disciplinary hearing" but did offer a meeting with the Mayor at 6:15 p.m. that day or any time between 7:30 a.m. and 10:00 a.m. the next day. *Id.*  Gross' counsel responded that same day by letter and asserted that neither he nor Gross were available during the offered times and, in any case, that the short period of time before the meeting would not give him time to prepare. (Doc. 51, Ex. 4, Depo. Ex. G, Shoub Ltr. 08/14/12).  Consequently, neither Gross nor his attorney met with the Mayor. (Doc. 51, Ex. 1, Gross Depo. at 146:17-150:11).  Thus, on August 15, Eisentrout again terminated Gross' employment. (Doc. 51, Ex. 4, Depo. Ex. C, Eisentrout Ltr. 08/15/12).

Because, with respect to the August 15 firing, Gross was given notice and an opportunity to respond, he cannot prevail on this claim as a matter of law and Defendants' motion for summary judgment is granted.[4]  The Court is sympathetic to the notion that those in Gross'

---

[4] Because the Court decides the issue on this basis, it does not reach the Defendants' assertion that Plaintiff needed to exhaust administrative remedies before filing a civil case pursuant to 42 U.S.C. § 1983.

position may find it difficult to substantively respond within the five-day window accorded to a mayor in which to inquire into a case and make her discipline determination. *See* Ohio Rev. Code § 737.19(B).  However, it does not offend the Constitution for the Ohio Legislature to require a quick response to pending discipline or a quickly scheduled hearing following notice of proposed discipline and this Court is without power to rewrite section 737.19.

### 4. Due Process Counterarguments

#### a. The Absence or Near Absence of Damages is not Fatal to Gross' Due Process Claim

Defendants argue that where there is no deprivation of pay, there can be no due process violation. (Doc. 53, D. Re. in Opp. to Mot. for Part. SMJ at 4-5).  Defendants' argument, however, goes too far.  The cases Defendant cites stand only for the proposition that an employer who suspends an employee with pay or places the employee on administrative leave with pay, has not deprived the Plaintiff of his property rights sufficiently to necessitate a pre-discipline hearing. *See, e.g.*, *Loudermill*, 470 U.S. at 545 (explaining that an employer "can avoid the [due process] problem by suspending with pay"); *Eggers v. Moore*, 257 F. App'x 993, 995 (6th Cir. 2007) (stating "paid leave is not an adverse employment action"); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that "a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action"); *Joseph v. City of Columbus*, Case No. 2:04-cv-754, 2006 U.S. Dist. LEXIS 69962, *22 (S.D. Ohio Sept. 27, 2006) (Sargus, J.) (remarking, "employers may avoid due process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave").

In this case, however, Gross was not placed on administrative leave on July 18, 2011 – he was fired.  The fact that he was later placed on administrative leave with back pay, retroactively

effective as of July 18, 2011, does not mean that he was not deprived of his property in the first place; to the contrary, it means he <u>was</u> deprived of his property and then, later, it was restored to him.  Gross does, in short, have a valid claim for being deprived of his property without due process of law; he just may have difficulty proving any significant damages.

> **b. Compliance with Ohio Rev. Code § 737.19 does not Absolve the Defendants' of their Responsibilities Under the United States Constitution**

Defendants claim that compliance with Ohio Revised Code, section 737.19 means that "Plaintiff's due process claim must fail as a matter of law." (Doc. 53, D. Re. in Opp. to Mot. for Part. SMJ at 7-8).  However, this is not the case.  As *Loudermill* shows, the constitutionally required opportunity to be heard <u>prior</u> to being fired is not dictated through and cannot be abridged by, the laws of the State of Ohio. 470 U.S. at 540-41.  The Supreme Court in *Loudermill* explained that, "the Due Process Clause provides that certain substantive rights -- life, liberty, and property -- cannot be deprived except pursuant to constitutionally adequate procedures," and that, "'[p]roperty' cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Id.*  "The right to due process," the Court said, "'is conferred, not by legislative grace, but by constitutional guarantee.  While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'" *Id.* at 541 (quoting *Arnet*, 416 U.S. at 167 (Powell, J., concurring in part and concurring in the result)) (citing *id.* at 185 (White, J., concurring in part and dissenting in part)).  Hence, compliance with section 737.19 would only foreclose Plaintiff's claim if section 737.19 mandated that Gross be provided with an opportunity to be heard prior to his termination.

Review of section 737.19 shows that it does not, explicitly, require such an opportunity.  It does provide that the marshal (or, presumably, chief) having determined to recommend that an

officer be disciplined, "shall certify this fact in writing, together with the cause for the suspension, to the mayor of the village and <u>immediately shall serve a true copy of the charges upon the person against whom they are made</u>." Ohio Rev. Code § 737.19(B) (emphasis added). The mayor then, "[w]ithin five days after receiving th[e] certification" will "inquire into the cause of the suspension and shall render a judgment on it.  If the mayor sustains the charges, the judgment of the mayor may be for the person's suspension, reduction in rank, or removal from the department." *Id.*  From this review of the text, two conclusions are apparent:

First, though section 737.19 does obliquely <u>suggest</u> the provision of a pre-disciplinary opportunity to be heard, it does not explicitly <u>require</u> one.  Hence, bare compliance with the letter of section 737.19, may not satisfy Fourteenth Amendment due process.  That is, section 737.19 does require immediate service of notice of impending discipline upon the allegedly offending officer and then subsequent review by the mayor within a five-day window. *Id.*  Thus, unless the mayor acts immediately, there will usually be some window in which an officer could request to meet with the mayor to discuss the charges before a decision is rendered.  However, there is no explicit requirement in section 737.19 that a mayor agree to meet with an officer and, of course, the mayor could, in theory, act almost immediately upon receiving notice of the proposed discipline (because immediate action would also be "[w]ithin five days"). *Id.*  Section 737.19 also requires that the mayor "inquire into the cause" and "render a judgment on it" and this suggests that the mayor should investigate, presumably hearing both sides of the story, and then exercise her own judgment.  However, again, there is no <u>explicit</u> requirement that a mayor entertain both sides of a dispute and thus there is no hard requirement of a pre-discipline hearing to be found in section 737.19.[5]  *Id.*

---

[5] This Court does not hold that section 737.19, or any part thereof, is unconstitutional, either facially or as applied in this case – merely that section 737.19 does not explicitly or fully address the constitutional due process

Second, despite Defendants' insistence to the contrary, Defendants did not fully comply with section 737.19 with respect to the July 18, 2011 firing.  Section 737.19 provides that when the marshal notifies the mayor of proposed discipline, the marshal must also "immediately [] serve a true copy of the charges upon the person against whom they are made." *Id.*  In other words, the accused officer and the mayor should receive notice of the proposed discipline, under this section, at roughly the same time.  However, with respect to the July 18, 2011 termination, the record shows that did not happen.  In her July 18, letter, Eisentrout indicates, "on July 14, 2011, I received the final report from Chief Kimberly Nuesse and discussed it at length with her. (Doc. 53, Ex. A, Eisentrout Ltr. 7/18/11).  However, she also said during deposition:

> Q:      As I understand it, you got a letter from Chief Nuesse recommending
>         that Officer Gross be terminated.  You subsequently approved that,
>         and all of that paperwork was served to Jason Gross at the same time?
>
> Eisentrout:  Yes.

(Doc. 51, Ex. 3, Eisentrout Depo. at  47:4-47:9).  In other words:

> Q:      In fact, [Gross] wasn't even given the charges until he was given the
>         notice that he had been fired, correct?
>
> Eisentrout:  That's my understanding.
>
> Q:      He got them both the same day, correct?
>
> Eisentrout:  That's my understanding.
>
> Q:      You're not aware of him being provided a copy of the charges that
>         were filed against him before he got your letter terminating him?
>
> Eisentrout:  That's my understanding.

(Doc. 47, Ex. 2, Eisentrout Council Testimony at 200:11-200:22).  Nuesse also confirms the chain of events:

> Q:      As I said, you hand-delivered both the charges and the termination letter
>         to Officer Gross' home along with Corporal Fenstermaker on Monday,
>         July 18th?

---

requirements.  Thus, it is possible to violate the Constitution while complying with section 737.19 just as it is possible to comply with the Constitution while complying with the statute, or to violate the statute while complying with the Constitution or, for that matter, to violate both at once.

Nuesse:  Yes.

Q:      Officer Gross had not received a copy of your charges prior to that date; is that correct?

Nuesse:  That is correct.

Q:      He got them both at the same time, the charges and the letter of termination?

Nuesse:  That's correct.

(Doc. 56, Ex. 2, Nuesse Council Testimony at  172:9-172:20).  Eisentrout got the charges against Gross on the 14th, spent some time with Chief Nuesse "inquir[ing] into the cause" for them, and then both Nuesse's letter and Eisentrout's judgment were simultaneously hand-delivered to Gross on the 18th. Ohio Rev. Code. § 737.19(B).  This is not what section 737.19 requires.

Defendants, in short, did not fully comply with section 737.19, but even if they had, that would not be, in itself, sufficient to show that they had complied with the Due Process Clause of the Fourteenth Amendment because section 737.19 makes no explicit provision for an opportunity to be heard <u>prior</u> to a discipline decision being rendered.[6]  As the United States Supreme Court made clear in *Loudermill*, such a pre-discipline "'hearing,' though necessary, need not be elaborate," particularly where, as here, a full post-discipline hearing is available. 470 U.S. at 545-46.  But, as to the July 18, 2011 firing, there was no such opportunity afforded and this fact, notwithstanding alleged compliance or non-compliance with state, local, or departmental rules, means the firing was accomplished in violation of the Due Process Clause of the Fourteenth Amendment. (*See* Doc. 51, Ex. 3, Eisentrout Depo. at 46:15-47:13 (Eisentrout confirming that no pre-discipline hearing opportunity was offered in relation to the July 18 firing)).  With respect to the August 15, 2012 firing, as discussed above, notice and an

---

[6] It bears direct comment, however, that nothing in section 737.19 explicitly or implicitly prohibits holding a pre-discipline hearing.  Thus, one could comply with both section 737.19 and *Loudermill*.

opportunity for a basic hearing (or meeting) was provided and thus, summary judgment in favor of Defendants on that claim is appropriate.

### B.  First Amendment Claim

To establish a *prima facie* case of First Amendment retaliation a would-be claimant must prove "that: (1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004); (citing *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2000)).[7]

#### 1.  Protected Activity

At this point in the litigation, Gross argues two potentially protected acts.  First, and primarily, he argues that his firing was in retaliation for his filing and then failing to settle, on Defendants' terms, this lawsuit. (Doc. 56, P. Re. in Opp. to Mot. for SMJ at 6-11).  Second, Gross argues that certain comments he made while off duty (which were allegedly erroneous) regarding department policy to the Executive Director of the Ohio chapter of MADD, precipitated his July 18, 2011 firing. *Id.* at 3-4, 10-11; (*see also* Doc. 27, 2d. Compl. at ¶ 26).

To be protected activity under the First Amendment, Gross must prove that his acts in relation to the lawsuit and his alleged comments to MADD constitute speech "as a citizen on a matter of public concern," *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2493 (2011) (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)), and that his "interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in 'promoting the efficiency of the

---

[7] It also bears note that even the existence of a *prima facie* case does not, of itself, entitle a Plaintiff to survive summary judgment.  "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (parallel citations omitted).

public services it performs through its employees.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006)).

With respect to the retaliation claim based on the maintenance of this lawsuit, the protected activity element is not dispositive of the issue. Hence the Court will assume, without deciding, that bringing and maintaining a lawsuit alleging that an Ohio mayor has a policy of failing to provide due process to terminated employees is speech by Gross, in his capacity as a citizen, on a matter of public concern, and that Gross' interest in doing so outweighed the state's interest in thwarting him based upon reasons of police efficiency.

With respect to the retaliation claim based on his allegedly erroneous off-duty comments to MADD, taking the view of the evidence most favorable to Plaintiff, the following facts are undisputed: Gross was at home and off duty when he received a telephone call from the Executive Director of MADD regarding a written reprimand that he had been issued in May of 2011. (Doc. 56, Ex. 1, Gross Aff. at ¶ 6). Gross read the reprimand aloud to the caller. *Id.* at ¶ 7. In pertinent part, he read:

> On or about May 3, 2011, around 0630 hours you stopped or permitted to have a vehicle stopped on Cleveland Avenue near Green Apple which was outside the Minerva Park village jurisdiction and in direct violation of General Order #1. You were also in violation of [sic] Chief's memo directive dated February 8, 2011 that reiterated information from the department meeting on January 29, 2011 and stated "Officers do not have the legal authority to [sic] misdemeanor or traffic enforcement outside village jurisdiction. If you observe a violation, you are to radio the appropriate jurisdiction and provide them the information." In this case you should have contacted Columbus Police Department via LEERN radio or through your radio with Franklin County dispatch to inform them of the observed violation, vehicle description, and direction of travel and description of the driver.

(Doc. 50, Ex. B, Gross Reprimand 05/04/11 at 1). During deposition, Gross testified about the interaction:

> Q:    All right. Tell me what happened with this issue with Mothers Against Drunk Driving, I'm going to call them MADD, what happened with this that you're aware of?

Gross: I had been issued a written reprimand stating that officers didn't have the legal authority to enforce traffic on Cleveland Avenue.  It referenced to a traffic stop that I made along with another officer that I was training on Cleveland Avenue on a suspected drunk driver.  I was issued a written reprimand stating that I didn't have the legal authority to do so, and it had been discussed with one of the residents that lived there.  And that resident called the executive director of Mothers Against Drunk Drivers to complain telling them that -- just to tell them what had happened; that an officer had been reprimanded for stopping a suspected drink[sic] driver.

The executive director of Mothers Against Drunk Drivers, Doug Scoles, contacted me at home on my cell phone and asked me if I had been reprimanded for making a stop on a suspected drunk driver, and I confirmed that that's what had happened.  And I had gone and actually -- I went and picked up my written reprimand and read it off word for word what the written reprimand said, because I didn't want to be misquoted, I wanted to make sure my facts were accurate.  And he, in return, wrote a letter to the chief of police and the mayor and I guess expressed his concern over general order number one.

Q:    Okay.  Did you tell him what general order number one said?

Gross: I didn't read the general order, no.

Q:    Okay.  Did you tell him that general order number one had an exception that clearly allowed you to pursue drunk drivers?

Gross: I read off what my written reprimand said I was to do.

(Doc. 51, Ex. 1, Gross Depo. at 153:22-155:13).  Based on this interaction, MADD sent a strongly-worded letter to Defendants in which it extrapolated Minerva Park policy from Gross' reprimand and expressed strong disagreement therewith. (Doc. 51, Ex. 4, Ex. S, Scoles Ltr.). Defendants argue, apparently cherishing the belief that it helps their case, that Plaintiff "misrepresent[ed] General Order #1" in this conversation with MADD. (Doc. 50, D. Mot. for SMJ at 4).  However, notwithstanding Defendants' assertions, the evidence in the record clearly reflects that Gross did not discuss or analyze General Order #1 or any other departmental policy.

Gross was speaking as a private citizen when he made the statements at issue.  He was at home, off-duty, speaking on his personal cell phone and there is no indication or evidence in the record that he was purporting to speak as a member of the police department. (Doc. 51, Ex. 1,

25

Gross Depo. at 153:22-155:13).  Thus, this situation is markedly different from cases where employees wrote memoranda, made statements, or authored reports during work hours and within the general scope of their employment. *See, e.g.*, *Garcetti*, 547 U.S. at 420-25, *Keeling v. Coffee County*, No. 12-6250, 2013 U.S. App. LEXIS 16593, *11-16 (6th Cir. Aug. 8, 2013), *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543-46 (6th Cir. 2007).  However, Gross was not speaking on a matter of public concern.

As discussed above, Gross did not discuss police policy with MADD or seek to give them information to effect public changes in the way drunk drivers were treated in the Village of Minerva Park. (Doc. 51, Ex. 1, Gross Depo. at 153:22-155:13).  Rather, MADD asked Gross why he was disciplined and he answered honestly and directly by reading his written reprimand to the caller. *Id.*  Though MADD then undertook First Amendment speech by writing a letter criticizing what it perceived to be the policy of the Village, Gross did nothing of the kind. (Doc. 51, Ex. 4, Ex. S, Scoles Ltr.).  Gross' only act was reading his reprimand to MADD (upon MADD's solicitation, no less) and this speech therefore constituted "nothing more than an example of the quintessential employee beef: management has acted incompetently." *Buckley v. City of Portage*, No. 98-1783, 1999 U.S. App. LEXIS 23254, *11 (6th Cir. Sept. 16, 1999) (quoting *Rahn v. Drake Ctr.*, 31 F.3d 407, 413 (6th Cir. 1994)).  In fact, Gross even testified about the tenor of the conversation with MADD:

> Gross: We didn't discuss general order number one, we just discussed the written reprimand.
>
> Q:     I didn't mention general order number one.  I'm asking you: You -- you were not happy about receiving this reprimand, were you?
>
> Gross: Correct.
>
> Q:     All right.  But you were upset about getting it, right?
>
> Gross: Correct.
>
> Q:     All right.  You thought it was unfair?

> Gross: I felt it was incorrect because I just felt that I did have the authority based on the previous chief what he had told me.

(Doc. 51, Ex. 1, Gross Depo. at 160:22-161:10).  Gross spoke not upon "matters of public concern" *Garcetti*, 547 U.S. at 417, but rather "on matters of personal interest." *Handy-Clay*, 685 F.3d at 539.

*Buckley*, cited above, bears an instructive factual resemblance to this case.  In *Buckley*, a police officer was publishing, anonymously, a newspaper (distributed to the department and public, including through Western Michigan University and the *Kalamazoo Gazette*) which criticized actions of the police department. 1999 U.S. App. LEXIS 23254, *1-7.  Two articles Buckley published, in particular, criticized the policy of allowing officers to earn overtime pay for attending committee meetings but not authorizing overtime pay for patrol duties. *Id.* at *3.  One article questioned whether "the citizens of Portage are getting short changed." *Id.*  The Sixth Circuit reviewed the case *de novo* and "conclude[d] that Mr. Buckley was speaking 'not as a citizen upon matters of public concern, but instead . . . upon matters only of personal interest . . . .'" *Id.* at *9 (quoting *Connick*, 461 U.S. at 147).  The Court reasoned:

> A close review of the content of these articles reveals that their primary focus is on the unavailability of overtime pay for patrol officers, not on the effect that the lack of such pay may have on the citizens of Portage.  In this regard the articles are much like the speech at issue in *Rahn v. Drake Center*, *supra*.  There a nurse sued her former employer, a hospital, claiming that she was fired for issuing a press release criticizing the hospital president's proposal for spending funds raised through a public tax levy.  This court concluded that, despite the critical comments on how public monies were being spent, the speech did not address a matter of public concern.  The court reasoned as follows:
>
>> "Here, the fact that [the plaintiff] believed that the money was not being spent in a wise fashion, by itself, is insufficient to find that the press release addressed a matter of public concern.  In addition, the reference to 'patient endangerment' does not make this a matter of public concern under the facts in this case.  The only mention of patient endangerment in the press release is located in the following paragraph: 'New work rules which have caused widespread discontent among the hospital staff which has created a

27

> high absenteeism, possibly developing a patient endangerment situation." [sic] The focus of this comment is not on patient endangerment arising from the misapplication of tax dollars; rather, the focus is on the employees' discontent with new work rules which might lead to a patient endangerment situation. This is 'nothing more than an example of the quintessential employee beef: management has acted incompetently.'" 31 F.3d at 412-13 (internal quotations omitted).
>
> When Mr. Buckley's articles are read in context, it is clear that his complaints center on Chief White's allocation of department funds for overtime pay. This is a matter of workplace concern, but in and of itself it is not a matter of public concern. *See Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir. 1988) ("The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern.") Buckley does comment that the citizens of Portage are getting short-changed, but he does so only after noting that fewer patrol officers on the street means that only half the officers can take a lunch break. The passing reference to the citizens of Portage, as *Rahn* teaches, is not enough to transform a beef about internal department funding allocations into comment on a matter of public concern.

*Buckley*, 1999 U.S. App. LEXIS 23254, *10-12.

Gross' communication with MADD was primarily about his having been reprimanded for stopping a drunk driver. The general order under which he was reprimanded was not debated nor, according to Gross' own testimony, even discussed. This was not a statement about matters of public concern – it was a conversation about one police officer's reprimand which MADD then, quite independently of Gross, extrapolated and engorged into a strident letter to the mayor.[8]

### 2. Adverse Action

As Gross was fired (twice, in fact), there is no doubt that he was "subjected to adverse action or deprived of some benefit" that "would deter a person of ordinary firmness from continuing to engage in th[e] [protected] conduct." *Farhat*, 370 F.3d at 588; *Thaddeus-X*, 175

---

[8] Having found that Gross' speech with MADD was not about a matter of public concern, the Court does not address whether Gross' "interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in 'promoting the efficiency of the public services it performs through its employees.'" *Handy-Clay*, 695 F.3d at 540 (quoting *Garcetti*, 547 U.S. at 417-18 (2006)). For the same reason, the Court does not find it necessary to address whether Gross' speech with MADD was a "substantial" or "motivating factor" for his July 18, 2011 termination. *Farhat*, 370 F.3d at 588; (citing *Leary*, 349 F.3d at 897).

F.3d at 394; *accord Pucci v. 19th Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010) (holding that firing

would "deter a person of ordinary firmness").

### 3. Was the Protected Activity a "Substantial" or "Motivating Factor" for the Adverse Action

On the undisputed summary judgment record in this case, and even construing the facts

in the light most favorable to Plaintiff, Gross was not fired because he either brought or

maintained this lawsuit.  Several factors convince the Court that this is so.

First, the timing is problematic.  This lawsuit was first filed in the Franklin County Court

of Common Pleas on December 7, 2011, but Gross was fired on July 18, 2011. (Doc. 3, Compl.)

(timestamp on original complaint shows date and court of filing).  When asked about the Village

Council's decision to modify her July 18 termination order, Mayor Eisentrout said she would

have preferred that they affirm her order and that Gross had remained terminated. (Doc. 51, Ex.

3, Eisentrout Depo. at  47:17-48:2).  In addition, Eisentrout testified that, after Gross returned to

work on October 19, 2011, she had discussions with Chief Nuesse regarding disciplining or

terminating Gross. *Id.* at 60:2-63:22; (*see also, e.g.*, Doc. 51, Ex. 4, Depo. Ex. U, Nuesse Memo.

04/10/12).  Chief Nuesse confirmed that after Gross returned to work on October 19, 2011, she

had such conversations with Eisentrout. (Doc. 51, Ex. 2, Nuesse Depo. at 6:22-7:11).  In short,

leaving aside the adequacy of legitimate reasons for terminating Gross, it is apparent that

Eisentrout and Nuesse desired Gross' termination both before and during this lawsuit.  Or, to put

it more plainly, since they wished to fire him before the lawsuit was filed and before settlement

was rejected, it is unlikely that the lawsuit was the cause of (or even a major factor in) the firing.

Second, Gross does not submit any proof that Defendants were actually motivated to fire

him by the lawsuit.  Gross argues that Eisentrout's statement, in deposition, that Defendants were

waiting to fire Gross because they wanted to see what happened at the mediation, means that

they fired him as a result of his refusal to settle the case. (Doc. 56, P. Re. in Opp. to Mot. for SMJ at 9-11; *see also* Doc. 51, Ex. 3, Eisentrout Depo. at 60:22-62:8). However, taken in context of the timing observation discussed above, Plaintiff's argument is not a reasonable one and the Court is only required, when deciding summary judgment, to "draw all <u>reasonable</u> inferences in favor of the nonmoving party." *Crawford*, 555 U.S. at 274 n.1 (emphasis added) (quoting *Brosseau*, 543 U.S. at 195, n.2). That is, as it is undisputed that Eisentrout desired Gross' termination both before and during this case, his refusal to settle could hardly have caused that desire. Thus, the reasonable explanation of the waiting-to-see-about-mediation comment is that if, in resolution of the case, Defendants could settle their differences with Gross (perhaps by his voluntary departure with or without some manner of payment) Defendants would be spared the litigious and unpleasant task of terminating him.

Third, Ohio Revised Code, section 737.19(B) is relatively permissive in its list of reasons for which a police officer may be fired. That is, in addition to rather serious reasons such as "gross neglect of duty, gross immorality, [and] habitual drunkenness," the section provides that an officer may be fired "for any other reasonable or just cause." Ohio Rev. Code § 737.19(B). This Court has reviewed the materials submitted by the parties detailing the job performance of Officer Gross. These documents primarily complain of Gross' failure to conduct a sufficient number of traffic stops, failure to properly interpret jurisdictional limitations, failure to properly collect evidence, report writing deficiencies, and failure to, on one occasion, use appropriate apprehension techniques. (Doc. 51, Ex. 4, Depo. Exs. J, K, L, M, U). The Court does not believe that, as Defendant put it, "[t]his case is about a police officer who thinks the rules do not apply to him." (Doc. 50, D. Mot. for SMJ at 2). Nevertheless, this Court cannot say that the Village was

30

without "<u>any</u> . . . reasonable . . . cause" for terminating Gross. Ohio Rev. Code § 737.19(B).

Indeed, Gross himself admitted that there may have been reasonable cause to terminate him:

> Q:      Well, the week before the mediation, do you believe that given the coaching and the problems you had had in the department that there was enough problems with you to terminate you?
>
> Gross: I guess.

(Doc. 51, Ex. 1, Gross Depo. at 27:6-27:11).

On summary judgment, as the party who will bear the burden of proof at trial, Gross has the responsibility to present evidence that this lawsuit was a "substantial" or "motivating factor" in his firing. *Farhat*, 370 F.3d at 588; *Celotex*, 477 U.S. at 322. The demonstrably persistent desire by Defendants to fire Gross predated this lawsuit and Gross does not present any evidence, given that timing context, that could meet his burden. Accordingly summary judgment is granted to both Defendants Eisentrout and Nuesse on Plaintiff's First Amendment claims.

### C.  Qualified Immunity

The Court has explained that summary judgment is granted to Nuesse on all of Gross' claims and Eisentrout on all of Gross' claims except the claim for denial of due process with respect to the July 18, 2011 firing. Therefore, the Court need not consider whether qualified immunity is due to Nuesse nor need it consider its application to Eisentrout with respect to Gross' First Amendment claims. However, in regards to Gross' due process claim against Eisentrout, this Court believes Plaintiff has met his burden and shown that summary judgment would, in the absence of some valid defense by Eisentrout, issue in his favor. Therefore, the Court must consider whether qualified immunity provides Eisentrout with a valid defense. For the reasons that follow, the Court decides that it does not.

"[The Sixth Circuit] applies a two-step inquiry to determine qualified immunity, which considers (1) whether the defendant violated a constitutional right; and (2) whether that right was

clearly established." *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (citing *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010)).  *Hensley* also noted, "In some instances this court considers a third inquiry, which is 'whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Id.* at 687 n.5 (quoting *Feathers v. Aey*, 319 F.3d 843, 846 (6th Cir. 2003)).  However, the Sixth Circuit has frequently (and increasingly in recent years) explained that "'[T]he three-step approach may in some cases increase the clarity of the proper analysis,' but '[i]n many factual contexts . . . , including this one, the fact that a right is "clearly established" sufficiently implies that its violation is objectively unreasonable.'" *Mott v. Mayer*, 524 F. App'x 179, 185-86 n.5 (6th Cir. 2013) (quoting  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)); *see also, e.g.*, *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 n.2 (6th Cir. 2013); *Williams v. Richland County Children Servs.*, 489 F. App'x 848, 851 (6th Cir. 2013); *Richardson v. Nasser*, 421 F. App'x 611, 616 (6th Cir. 2011); *Zulock v. Shures*, 441 F. App'x 294, 302 n.2 (6th Cir. 2010); *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).  Court will use the two-step approach in this case and notes that this is consistent with the two-step approach laid out by the United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[9]

As discussed above, the Court has already determined that Eisentrout violated Gross' right to due process when she terminated him, without providing him with a pre-termination hearing of some kind.  The remaining question, then, is whether that right was clearly established at the time of Gross' firing in July of 2011.

---

[9] Note, however, that the Supreme Court subsequently made it optional which of the two steps is to be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 231-42 (2009).

The right to "some kind of hearing" was clearly established by July 2011.  *Loudermill*, which "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing <u>before</u> he is deprived of any significant property interest,'" was decided by the United States Supreme Court in 1985 – more than two decades before Eisentrout, without providing Gross with a hearing of any kind, terminated him. 470 U.S. at 542 (quoting *Boddie*, 401 U.S. at 379).  If this were not enough, the Sixth Circuit has expressly stated, in reliance upon *Loudermill*, that the requirement of a pre-termination hearing is clearly established:

> At the time of [Plaintiff's] termination in August 2002, Supreme Court precedent had clearly established that a pre-termination hearing is required before terminating an employee who holds a property interest in her employment, and also clearly established that statutes restricting the terms and procedures under which an employee may be terminated create such a property interest. *See Loudermill*, 470 U.S. at 541.

*Silberstein v. City of Dayton*, 440 F.3d 306, 316 (2006); *see also Pucci*, 628 F.3d at 767. Eisentrout is not entitled to qualified immunity.

## IV.  CONCLUSION

Plaintiff's motion for partial summary judgment is **GRANTED**.  Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Defendant Nuesse is entitled to summary judgment on all claims against her and is hereby entitled to **JUDGMENT** in her favor.  Defendant Eisentrout is entitled to summary judgment on all claims except for Plaintiff's claim against her for denial of due process with respect to the July 18, 2011 firing.  Defendant Eisentrout remains a party to this litigation.

Defendants' motion to supplement their summary judgment motion is **GRANTED**.

The Clerk is directed to **TERMINATE** Kimberly Nuesse as a defendant in this case and to **REMOVE** documents 47, 50, and 54 from the Court's pending motions list.

The parties are **ORDERED** to submit briefing on the issue of what damages will be sought by Plaintiff.  Plaintiff's briefing should include a discussion of what types of damages are sought and why he would be entitled to them.  Plaintiff's counsel is also directed to include briefing on the issue of fees that may, or may not, be sought under 42 U.S.C. § 1988.  Plaintiff's briefing shall be due no earlier than 30 days after the date this decision is docketed and no later than 30 more days after that date.  The Defense shall respond within 30 days of the filing of Plaintiff's brief.  Any reply shall be due 15 days following the filing of the Defense' response.

If, in light of this opinion, the parties wish to engage in mediation or other settlement-related activities, the Court will, upon joint motion of the parties, suspend briefing on the issue of damages.

**IT IS SO ORDERED.**


_____*/s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**

34